UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

GARNEY CREWS,                                   :

                             Plaintiff,             :

            - against -                        :       **REPORT AND
                                                        RECOMMENDATION**

MICHAEL J. ASTRUE,                             :       **TO THE HONORABLE**
Commissioner of Social Security,                       **LAURA TAYLOR SWAIN**

                                :

                        Defendant.             10 Civ. 5160 (LTS) (FM)

----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/27/12___

**FRANK MAAS**, United States Magistrate Judge.

        Plaintiff Garney Crews ("Crews") brings this action pursuant to Section

205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a final

decision of the Commissioner ("Commissioner") of the Social Security Administration

("SSA") denying his application for a period of disability and disability insurance

benefits.  The parties have filed cross-motions for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the

Commissioner's motion (ECF No. 9) should be granted and Crews' motion (ECF No. 11)

should be denied.

I.     Background

       A.     Procedural History

              On March 4, 2002, Crews filed an application for a period of disability and

disability insurance benefits under Title II of the Act.  (Tr. 51-59).[1]  Crews alleged that he

had been unable to work since December 5, 2000, because of back and neck injuries

sustained in a car accident, as well as diabetes.  (Id. at 51, 90).  After the SSA denied his

application based on a state agency review, Crews requested a de novo hearing before an

administrative law judge ("ALJ").  (Id. at 25, 29-33).

              On September 5, 2003, ALJ Dennis Katz held a hearing, during which

Crews was represented by Scott Goldstein, Esq.  (Id. at 374-95).  Crews was the only

witness to testify at the hearing.  (Id.).  Thereafter, on October 30, 2003, ALJ Katz issued

a written decision in which he concluded that Crews was not disabled within the meaning

of the Act.  (Id. at 13-20).  This decision became final on May 12, 2007, when the

Appeals Council denied Crews' request for review.  (Id. at 3-6).

              Crews then timely initiated an action in federal court.  (07 Civ. 6374, ECF

No. 2).  Pursuant to a stipulation and order dated January 15, 2008, the case was

remanded to the Commissioner for further proceedings.  (Id., ECF No. 9).  As the

Appeals Council explained in a post-remand order vacating ALJ Katz's decision, the ALJ

had failed to consider certain medical records from the Veterans Administration ("VA")

---

              [1]     Citations to "Tr." refer to the certified copy of the administrative record filed with
the Commissioner's answer.  (ECF No. 7).

to determine Crews' residual functional capacity ("RFC"), in violation of 20 C.F.R.

§ 404.1545(a).  (Tr. 423-24).  The Appeals Council therefore ordered the ALJ to obtain

updated medical records, including records from the VA; "consider all the pertinent

evidence," including the results of any renewed hearing, before making a new RFC

determination; and "take any further action needed to complete the administrative record

and issue a new decision."  (Id. at 424).

      ALJ Katz held a second hearing on April 7, 2008, during which Crews

again was represented by Mr. Goldstein.  (Id. at 645-64).  On June 25, 2008, the ALJ

issued another decision concluding that Crews was not disabled.  (Id. at 407-16).  As

before, the Appeals Council declined to review Crews' case.  (Id. at 396-98).

      Crews timely commenced this action on July 6, 2010.  (ECF No. 2).

Thereafter, on July 23, 2010, Your Honor referred the case to me for a Report and

Recommendation.  (ECF No. 5).  The Commissioner filed his answer on November 9,

2010, (ECF No. 7), followed by a motion for judgment on the pleadings pursuant to Rule

12(c) on February 28, 2011 (ECF No. 9).  Crews, in turn, filed a cross-motion for

judgment on the pleadings on March 15, 2011.  (ECF No. 11).  The Commissioner filed

his reply papers on March 25, 2011.  (ECF No. 13).  The cross-motions consequently are

fully submitted.

B.      Relevant Facts

1.      Non-Medical Evidence

Crews was born on February 19, 1959.  (Tr. 51).  He served in the United

States Marine Corps as a military police officer from 1977 to 1981.  (Id. 662-63).  He is a

high school graduate who also took courses in recreational therapy at San Diego City

College from September 1980 to January 1981.  (Id. at 96, 284).

Beginning in 1983, Crews spent six years working as a "shipping room

associate" for a coat company.  (Id. at 81).  This job required Crews to lift fifty pounds or

more frequently, as his responsibilities included loading and unloading trucks, as well as

packaging and stocking coats.  (Id. at 84).  Crews left this job in October 1989 for a

position as a therapy aide at the Middletown Psychiatric Center in Middletown, New

York.  (Id. at 81, 83).  There, Crews worked with mentally ill patients, distributing their

medication, resolving confrontations among them, and assisting certain of them with

activities of daily living, such as showering and getting dressed.  (Id. at 83).

In April 1994, Crews took a position as a developmental aide at a group

home for the mentally challenged.  (See id. at 81).  At the group home, Crews assisted ten

people, four of whom were wheelchair bound, with activities of daily living, including

bathing, feeding, taking medication, and using the bathroom.  (Id. at 82).  Like his prior

jobs, this position involved physically demanding work, as Crews frequently had to lift

the residents to help them with such activities as getting into bed.  (Id.).

4

Crews stopped working at the group home after sustaining back and neck injuries in a motor vehicle accident that occurred on December 5, 2000, while he was driving a van back to the home.  (Id. at 237, 380).  He did not work thereafter for nearly six years, although he did receive workers' compensation benefits until at least October 2003.  (Id. at 392, 412, 649).

In October 2006, Crews began working as a school bus monitor, supervising children from ages eight to sixteen, for an average of twenty-five hours per week.  (Id. at 649-51).  He stopped working as a bus monitor in February 2008, however, because the job put too much strain on his back.  (Id. at 649, 652).  Thereafter, he was employed as a counselor at a drug and alcohol rehabilitation center, where he worked up to thirty hours per week, even though he only worked on the weekends.  (Id. at 425, 651-53).

In April 2002, Crews completed a "function report" in connection with his social security claim.  (Id. at 99-106).  He wrote that, with the help of friends and family, he provided basic care for his daughter, who was ten years old at the time.  (Id. at 100). He also noted that he was able to dress, bathe, and otherwise groom himself, though not without pain.  (Id. at 100-01).  In addition, he could drive a car and went shopping two to three times per month.  (Id. at 102-03).  He did not do most of the household chores because of his physical impairments, but did "supervise."  (Id. at 102).

5

2.     Medical Evidence

a.     Back and Neck Pain

i.     Horton Medical Center and Dr. Hui

As noted previously, Crews was injured in a car accident on December 5, 2000. (Id. at 147, 237, 379-80).  Immediately after the accident, Crews was taken to the emergency room at Horton Medical Center in Middletown, New York. (Id. at 147-51). The results of an x-ray of Crews' spine taken that day revealed no structural damage. (Id. at 151).  He was diagnosed as having a cervical strain and a lumbar sprain, was prescribed Vioxx[2] and Flexeril,[3] and was discharged the same day with instructions that he could return to work on December 7, 2000. (Id. at 148, 150).

On December 12, 2000, one week after the accident, Crews saw his primary care physician, Raymond Hui, M.D., because he still had pain in his upper and lower back, along with occasional numbness in his thigh. (Id. at 188, 237).[4]  Dr. Hui's notes from that visit indicate that Crews was able to walk on his toes and heels, and that the straight leg raising ("SLR") test was negative.[5] (Id. at 188).  Dr. Hui diagnosed Crews

---

[2]     Vioxx is a trademark for a preparation of rofecoxib, a nonsteroidal antiinflammatory drug used to manage acute pain.  See Dorland's Illustrated Medical Dictionary 1677, 2086 (31st ed. 2007) [hereinafter Dorland's].

[3]     Flexeril is a brand name for cyclobenzaprine hydrochloride, a muscle relaxant administered to relieve muscle spasms.  Id. at 463, 725.

[4]     The ALJ mistakenly refers to Dr. Hui as Dr. Lee.  (See Tr. 14, 410).

[5]     The straight leg raising test "is a physical examination technique to determine whether there exists an abnormality of the sciatic nerve."  Calzada v. Astrue, No. 09 Civ. 3926

(continued...)

with a soft tissue injury.  (Id.).  In a report subsequently submitted to the New York State

Workers' Compensation Board ("WCB"), Dr. Hui opined that Crews was then "totally

disabled," but could return to work by December 19, 2000.  (Id. at 192).

ii.     Dr. Polepalle

Dr. Hui referred Crews to Sunitha Polepalle, M.D., a physiatrist, who

conducted a physical examination of Crews on December 18, 2000.  (Id. at 237-38, 412).

Dr. Polepalle observed that Crews was able to walk on his heels and toes.  The SLR test

again was negative.  Crews also had full strength in all upper extremity muscle groups.

He did, however, experience significant pain when he extended his back and rotated his

neck.  Dr. Polepalle concluded that Crews' back and neck pain was caused by cervical

and lumbar facet[6] dysfunction, as well as myofascial[7] pain.  She also noted that Crews

had scoliosis,[8] which she wanted to evaluate further.  She recommended that he continue

taking Vioxx and Flexeril, begin physical therapy, and remain out of work for at least five

weeks.  (See id. at 237-38).

Dr. Polepalle saw Crews an additional eleven times during 2001.  (Id. at

224-36).  She consistently noted tenderness in Crews' back along the lumbar facets and

_____

[5](...continued)
(RJS) (MHD), 2010 WL 4683570, at *8 n.30 (S.D.N.Y. Nov. 17, 2010).

[6]     A facet is "a small plane surface on a hard body, as on a bone."  Dorland's 676.

[7]     "Myofacial" means "pertaining to or involving the fascia surrounding and associated with muscle tissue."  Id. at 1241.

[8]     Scoliosis is "an appreciable lateral deviation in the normally straight vertical line of the spine."  Id. at 1706.

paraspinals,[9] as well as pain when he extended or rotated his back.  (Id. at 224, 226-36).

Each SLR test performed, however, was negative.  (Id. at 228-29, 232, 236).  In addition,

the results of an x-ray taken on January 24, 2001, indicated that although Crews suffered

from scoliosis, there were no congenital spinal abnormalities, all pedicles[10] were normal,

and there were no paraspinal soft tissue masses.  (Id. at 235).

That year, Dr. Polepalle prescribed various pain medications in addition to

Vioxx and Flexeril, including Celebrex,[11] Neurontin,[12] and Lidoderm patches.[13]  (Id. at

227-28, 236).  In addition to these medications, Dr. Polepalle administered trigger point

injections of cortisone and analgesics.  (Id. at 152, 157, 164).  She also encouraged Crews

to begin physical therapy, which he eventually did in March.  (Id. at 231-38).

In both April and July 2001, because the medication, injections, and

physical therapy helped only moderately to ease Crews' back pain, Dr. Polepalle

requested that the WCB authorize an MRI scan of Crews' spine.  (Id. at 226, 228-29).

---

[9]      The paraspinals are the muscles adjacent to the spine.
http://www.merriam-webster.com/medical/paraspinal (last visited Mar. 21, 2012).

[10]      A pedicle is a stub of bone that connects the lamina to the vertebral body to form
the vertebral arch.  http://www.spine-health.com/glossary/p/pedicle (last visited Mar. 21, 2012).

[11]      Celebrex is a trademark for a preparation of celecoxib, a nonsteroidal
antiinflammatory drug used in the treatment of osteoarthritis and rheumatoid arthritis.  Dorland's
317.

[12]      Neurontin is a brand name for gabapentin, a drug primarily used to treat partial
seizures.  Id. at 764, 1287.

[13]      Lidoderm is a brand name for lidocaine, a local anesthetic that is applied topically
to the skin and mucous membranes.  Id. at 1048.

MRIs of Crews' lumbar and cervical spine eventually were performed in August 2001.[14]
(Id. at 224-25).  The MRI revealed mild disc bulges at Crews' C4 through C7 vertebrae.
(Id. at 224).  It also showed that Crews' spinal canal appeared to narrow from C4 through
C7, and that there were "diffuse" posterior disc bulges at L2-3 and L5-S1.  (Id.).  "Severe
facet joint osteoarthropathy[15] on the left side at L3-4" also was present.  (Id.).  After Dr.
Polepalle encouraged Crews to look for a job that did not require heavy lifting, bending,
or twisting, Crews participated in vocational retraining.  (Id. at 224, 228-30).

       Dr. Polepalle continued to treat Crews between 2003 and 2007.[16]  (Id. at
356-57, 371-72, 539-52).  During more than one dozen visits in that period, Dr.
Polepalle's observations regarding Crews' back and neck pain are largely similar to those
discussed above.  Thus, she consistently noted that:  Crews was suffering from lumbar
facet dysfunction, (id. at 356-57, 542, 546-47, 549-51), as well as lumbar radiculopathy,[17]
(id. at 539, 543, 545); he had limited range of motion in his back, often experiencing pain
when it was flexed, extended, or rotated, (id. at 356-57, 371, 542-43, 545-46, 549-551);
his gait was normal, (id. at 356, 546-47); his SLR tests were negative, (id. at 357, 545,

---

[14]     Dr. Polepalle's note concerning the MRI mistakenly states that the MRI was
completed in August 2000, which was before the accident.  (Id. at 224).

[15]     Osteoarthropathy is "any disease of the joints and bones."  Dorland's 1366.

[16]     During this time period, Crews also was seen occasionally by Dr. Joe Lee, Dr.
Polepalle's colleague.  (See Tr. 370, 552-53).

[17]     Lumbar radiculopathy "is a nerve irritation caused by damage to the discs
between the vertebrae."  Jefferson v. Astrue, No. 3:06cv1729 (MRK) (WIG), 2008 WL 918473,
at *2 n.4 (D. Conn. Mar. 11, 2008).

550-51); he experienced tenderness in his back, particularly along the lumbar facets and paraspinals, (id. at 542-43, 545-47, 549, 551); and the various medications and physical therapy prescribed for him only moderately improved his condition (id. at 371-72, 542, 550-51).  Dr. Polepalle ultimately assessed Crews as having a "permanent partial disability."  (Id. at 371, 546-47, 550-51).

### iii.    Dr. Fraser

Dr. Polepalle referred Crews to Alleyne Fraser, M.D., a neurosurgeon, who examined Crews on February 12, 2001.  (Id. at 164-67).  Dr. Fraser observed that Crews had full strength throughout his body, a normal gait, and "good range of motion" in both his back and neck.  (Id. at 166).  From a neurological perspective, Dr. Fraser commented that Crews was "essentially nonfocal."[18]  (Id.).  She concluded that Crews "would most likely benefit from a course of physical therapy," which she prescribed.  (Id. at 166-67).  She further opined that his scoliosis was "stable and probably not contributing to his present symptoms."  (Id. at 166).

In April 2001, after Crews reported that four weeks of physical therapy had not reduced his pain significantly, Dr. Fraser, like Dr. Polepalle, requested an MRI of Crews' spine.  (Id. at 162).  The results of the August 2001 MRI, however, did not change Dr. Fraser's opinion with respect to the appropriate course of treatment for Crews.

---

[18]    The implication of the term "nonfocal" is that the neurological "examination is normal, or at least that there is no asymmetry."  See William W. Campbell, et al., DeJong's The Neurologic Examination 302 (2005), available at http://books.google.com/books?id=CvgxUpZ7ZfUC&lpg=PP1&pg=PA302#v=onepage&q&f=false.

10

Noting in November 2001 that Crews had no upper or lower extremity weakness, a normal gait, "quite good" range of motion in his lower back and neck, and "no significantly herniated discs" in either his cervical or lumbar spine, Dr. Fraser opined that Crews was not in need of neurosurgical intervention at that time, and recommended that he continue "conservative treatment" with Dr. Polepalle.  (Id. at 161).

iv.   <u>Dr. Raucci</u>

In 2001, Dr. Polepalle also referred Crews to a chiropractor, Michael Raucci, who began treating Crews for his back and neck pain in April of that year.  Like Dr. Polepalle, Dr. Raucci noted that Crews experienced pain in lumbar extension, limited and painful cervical range of motion, and tenderness in the cervical, thoracic, and lumbar paraspinals.  He diagnosed Crews with "multiple level facet syndrome, chronic myofascial pain syndrome of the paraspinals, headaches of myofascial origin, and nonspecific intervertebral disc injuries with associated intermittent radiculitis."[19]  (Id. at 338-39).

In June 2001, after approximately two months of chiropractic treatment and "relative nonimprovement," Dr. Raucci also asked the WCB to approve an MRI scan. (Id. at 328).  On August 31, 2001, shortly after the MRI was performed, Dr. Raucci noted that Crews had a "full disability."  (Id. at 318).

_____

[19]     Radiculitis is the "inflammation of the root of a spinal nerve."  <u>Dorland's</u> 1595.

v.   <u>Castle Point</u>

Crews also was treated for back and neck pain at the Veterans Admistration

hospital in Castle Point, New York ("Castle Point").  Crews' first physical examination at

Castle Point was on November 1, 2002.  (<u>Id.</u> at 295).  The physician who examined him,

Muhammad Rehmani, M.D., observed that Crews was in "no acute distress" at that time

and had reported that he was in "generally good health."  (<u>Id.</u> at 296-97).  Dr. Rehmani's

notes indicate that Crews had a normal gait, normal muscle strength and movement, and a

supple neck, and that his sensory examination was normal.  (<u>Id.</u> at 297).  Dr. Rehmani

concluded that Crews had chronic lumbago[20] and degenerative disc disease as a result of

his motor vehicle accident, with "cervical disc herniation as per mri scan."  (<u>Id.</u>).  Dr.

Rehmani nevertheless remarked that these ailments, while chronic, were "stable."  (<u>Id.</u> at

298).

In March 2003, Dr. Rehmani referred Crews to Castle Point's Pain

Management Clinic ("PMC").  (<u>Id.</u> at 260).  Crews initially was evaluated by Joby David,

a nurse practitioner, who noted that on a scale of one to ten, with ten being the most

severe, Crews' rated his present back and neck pain as six to seven.[21]  (<u>Id.</u> at 287-89).

The next month, Hooja Kim, M.D., examined Crews.  (<u>Id.</u> at 260-65).  Dr. Kim opined

---

[20]     Lumbago is "acute or chronic pain (as that caused by muscle strain) in the lower
back."  MedlinePlus Merriam-Webster Medical Dictionary, <u>available at</u> http://www.merriam-
webster.com/medlineplus/lumbago (last visited Mar. 21, 2012).

[21]     The nurse practitioner also noted that Crews was using a Fentanyl patch
prescribed by a private physician.  (<u>Id.</u> at 287).  Fentanyl is a narcotic pain medication.
http://www.drugs.com/fentanyl.html (last visited Mar. 21, 2012).

that the causes of Crews' pain were lumbar spondylosis,[22] bulged cervical discs, and

scoliosis.  (Id. at 261).  Crews described his back pain as a four to five in terms of its

severity, while his neck pain was a three to four.  (Id. at 261-62).  Dr. Kim described the

range of motion in Crews' back and neck as "painful."  (Id. at 262).  Crews also

experienced pain in both legs when stretched to a ninety degree angle during the SLR test.

(Id.).  Dr. Kim's assessment was lumbar spondylosis with severe facet arthropathy,[23] and

cervical spondylosis[24] with chronic neck pain.  (Id. at 263).  Dr. Kim recommended

physical therapy and acupuncture, and prescribed naproxen[25] and gabapentin for the pain.

(Id.).

　　　　　Crews saw Dr. Kim for follow-up visits in May and July 2003.  (Id. at 278-

81, 479-82).  During his May visit, Crews reported that he "was doing fair with pain.

Able to tolerate.  Naproxen helps."  (Id. at 278).  Dr. Kim's progress notes from Crews'

visit in July similarly state that Crews was "continuing with physical therapy and doing

better.  Naproxen helps with pain.  Pain at tolerable level at this time."  (Id. at 479).  On a

-------

[22]     Lumbar spondylosis is a "degenerative joint disease affecting the lumbar
vertebrae and intervertebral discs, causing pain and stiffness, sometimes with sciatic radiation
due to nerve root pressure by associated protruding disks or osteophytes."  Dorland's 1780.

[23]     Arthrophy is a general term meaning "any joint disease."  Id. at 160.

[24]     Cervical spondylosis is a "degenerative joint disease affecting the cervical
vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with
pain or paresthesia radiating along the upper limbs as a result of pressure on the nerve roots."  Id.
at 1780.

[25]     Naproxen is a non-steroidal anti-inflammatory drug used to treat, inter alia, pain
and inflammation.  Id. at 1251.

scale of one to ten, Crews assessed his back and neck pain, respectively, as a four and a three to four in May, and as a four to five and five to six in July.  (Id. at 279, 480).  Crews still had a painful range of motion in his back and neck, as well as pain in both legs when stretched to a ninety degree angle during the SLR test.  (Id. at 280, 481).

In addition to receiving treatment at the PMC, Crews participated in physical therapy at Castle Point from May to July in 2003.  (Id. at 255-57, 276-78, 478-79, 484-85, 488).  At his initial evaluation, Crews rated the severity of his pain as an eight in the morning, but only a four in the afternoon.  (Id. at 277).  The physical therapist noted that Crews' muscle strength was five out of five, but that he had a positive psoas test.[26]  (Id.).  The therapist assessed Crews' overall rehabilitation potential as fair.  (Id.).

The therapist's notes from Crews' next three visits remarked that Crews was "[p]rogressing slowly."  (Id. at 484-85, 488).  She encouraged him to increase his activity and also the pace of his walking.  (Id. at 484-85, 488).  On July 31, 2003, the last date that Crews received physical therapy, he assessed the severity of his pain as a four.  (Id. at 478).  His SLR and general strength tests both were normal.  (Id.).  The

---

[26]     The psoas test measures the strength and flexibility of the psoas, the muscle responsible for flexing the thigh or trunk.  Id. at 1228; http://medinfo.ufl.edu/year1/bcs/clist /abdomen.html#AA19 (last visited Mar. 21, 2012).

therapist provided Crews with a TENS Unit[27] for treatment at home because the plan was to "discontinu[e] hospital based [physical therapy]."  (Id. at 478-79).

### vi.    Non-Treating Sources

In 2001 and 2002, Crews was examined consultatively by three physicians and a chiropractor in connection with his workers' compensation and social security cases.  The first such physician he saw was Paul Jones, M.D., an orthopedic surgeon who examined Crews on February 8, 2001, at the WCB's request.  Dr. Jones noted that the range of motion in Crews' shoulders and neck was normal, although his lower cervical spine and trapezius were sensitive.  Crews' reflexes and sensation were intact and his SLR test was normal.  Crews had a "moderate palpable spasm in his lower back" and experienced pain when flexing his back forward at seventy degrees.  Dr. Jones diagnosed Crews with cervical and lumbar syndrome and determined that he had a "moderate partial disability."  (Id. 152-54).

Crews next was evaluated in July 2001 by Lawrence Schulman, M.D., at the WCB's request.  Dr. Schulman noted that Crews had a normal gait and walked on his heels and toes without difficulty.  Crews began to feel pain, however, when flexing his lower back to fifty degrees, or at twenty degrees when extending it.  Dr. Schulman

---

[27]     "'TENS' is the acronym for Transcutaneous Electrical Nerve Stimulation.  A 'TENS unit' is a pocket size, portable, battery-operated device that sends electrical impulses to certain parts of the body to block pain signals.  The electrical currents produced are mild, but can prevent pain messages from being transmitted to the brain and may raise the level of endorphins (natural pain killers produced by the brain)."  Verhow v. Astrue, 08-CV-6423-CJS, 2009 WL 3671665, at *8 n.5 (W.D.N.Y. Oct. 29, 2009).

performed the SLR test with Crews in a supine position.  The test was positive on the right leg at seventy degrees.  Crews also "had diffuse tenderness over the low back," particularly over the facet joints at L4-5 and L5-S1.  He was able to flex, extend, and rotate his neck fully without pain, however, and his cervical spine was not tender.  As Dr. Schulman observed, "there was basically a negative exam of the neck."  Dr. Schulman diagnosed Crews with low back syndrome with lumbar strain and a "resolving" cervical strain.  He determined that Crews had a "mild to moderate partial temporary disability referable to his low back."  Dr. Schulman opined that Crews' could "perform a light duty position with no heavy lifting or repetitive bending or restraining patients."  (Id. at 156-58).

Robert Pearl, D.C., conducted three chiropractic examinations of Crews for the WCB between 2001 and 2003.  Following the September 21, 2001 examination, Dr. Pearl observed that Crews' range of motion in his low back and neck was reduced with respect to flexion, extension, and lateral flexion.  He also noted the presence of spasm in the low back, left trapezius, and at the C5 vertebra.  Dr. Pearl diagnosed Crews with a "[c]ervical strain/sprain," "[c]ervicobrachial syndrome," "low back strain/sprain," and "degenerative arthritic changes in the lumbar spine" that were "severe in nature."  Dr. Pearl's prognosis for Crews was "guarded."  He recommended that Crews continue to receive chiropractic care from Dr. Raucci for another twelve weeks, at which point a reexamination would be in order.  (Id. at 173-76).

16

Dr. Pearl reexamined Crews on January 18, 2002.  His findings with respect to Crews' range of motion in his cervical and lumbar spine at that time were similar to those made during his previous examination.  Dr. Pearl again noted the presence of spasm in the left trapezius and at the C5 vertebra.  Crews also experienced tenderness and spasm in the left paraspinal musculature between the L4 and S1 vertebrae.  Dr. Pearl's diagnoses remained unchanged, as did his "guarded" prognosis.  He recommended that Crews continue to see a chiropractor, but no more than two to three times per month.  (Id. at 168-72).

Dr. Pearl's third examination took place on February 28, 2003.  (Id. at 350). The range of motion in Crews' cervical spine and lower back again was reduced with respect to flexion, extension, rotation, and lateral bending, but had not changed significantly since the last examination.  (Compare id. at 170, with id. at 352).  Crews experienced spasm in the left trapezius and C4 areas, as well as at the L4-S1 vertebrae. (Id. at 352).  Dr. Pearl opined that Crews had a "permanent partial disability" and that his prognosis was "[p]oor."  (Id. at 353).  Although Dr. Pearl found that Crews benefitted only minimally from chiropractic care, he recommended that Crews continue to see a chiropractor one to two times per month "to help him continue his activities of daily living."  (Id. at 354).

The final physician to examine Crews consultatively was Jogendra Chhabra, M.D., to whom Crews was referred in connection with his Social Security disability claim.  Dr. Chhabra evaluated Crews on April 8, 2002.  (Id. at 239-41).  Dr.

17

Chhabra's report indicates that Crews was not in any acute distress that day.  Dr. Chhabra also noted that Crews had a normal gait, although he walked slowly.  He had full strength in both his upper and lower extremities.  The range of motion for his cervical spine was limited to forty-five degrees flexion, thirty degrees extension, sixty degrees rotation, and thirty degrees lateral flexion.  The range of motion for Crews' lumbar spine was forty-five degrees in flexion, and fifteen degrees in extension, rotation, and lateral flexion.  His SLR test was negative.  No sensory deficit or muscle atrophy were noted.  Dr. Chhabra diagnosed Crews as suffering from, inter alia, chronic backache syndrome and cervical spondylosis.  He opined that Crews had "mild-to-moderate limitations with bending, lifting, carrying, and with heavy exertional work, as well as with prolonged sitting, standing, or climbing stairs."  (Id. at 241-43).

b.     Diabetes

Crews was diagnosed with diabetes mellitus during the mid-to-late 1990s. (Id. at 153, 157, 224).  On December 10, 2001, Dr. Polepalle noted that Crews was experiencing numbness and tingling in both of his hands and feet as a result of his diabetes.  (Id. at 224).  She further observed that Crews had decreased sensation to pin pricks in his bilateral median nerve distributions.  (Id.).  Consequently, she diagnosed Crews with diabetic neuropathy.[28]  (Id.).  A subsequent electromyography ("EMG") performed on February 18, 2002, confirmed Dr. Polepalle's diagnosis, as the EMG

---

[28]     Neuropathy is a "functional disturbance or pathological change in the peripheral nervous system."  Dorland's 1287.

revealed "evidence of a diffuse sensory peripheral neuropathy" and "a mild left ulnar

mononeuropathy at the elbow without any evidence of denervation."  (Id. at 177, 358-67).

Dr. Kim also diagnosed Crews with diabetic neuropathy in April 2003, similarly noting

that he had diminished sensation to pin pricks in both hands and feet.  (Id. at 263).

   Apart from persistent numbness and tingling, however, Crews' hands and

feet otherwise were normal.  (See id. 274, 295).  Indeed, Dr. Chhabra noted that Crews'

hand and finger dexterity were intact, his grip strength was five out of five, and he had

"no limitations with the use of his upper extremities for fine and gross motor activities."

(Id. at 243).  Crews did, however, wear orthopedic shoes.  (Id. at 258).

   In addition, although Crews experienced blurred vision as a result of his

diabetes, (id. at 237), there was no evidence of diabetic retinopathy[29] (id. at 208, 270, 614,

621).

   c. Depression

   During his initial evaluation on November 1, 2002, Dr. Rehmani noted that

Crews was suffering from depression.  (Id. at 297).  Accordingly, Dr. Rehmani scheduled

a mental health consultation for Crews.  (Id. at 476-77).  On December 16, 2002, Crews

met with Jay Buckiewicz, a staff psychologist at Castle Point.  (Id. at 294-95).  After a

forty-five minute initial session, Dr. Buckiewicz diagnosed Crews with an "Adjustment

---

   [29] Retinopathy, also known as retinitis, is an inflammation of the retina.  Dorland's
1658-59.

Reaction," observing that Crews found "himself bored and frustrated by his discomfort and inability to exercise without pain."  (Id.).

In March 2003, Crews again met with Dr. Buckiewicz, who noted that Crews was "clearly frustrate[d] by his constant pain from his automobile accident," and "also having a difficult time learning how to manage his diabetes."  Crews also expressed his discontent with "going from an active lifestyle to a pain-filled existence seemingly overnight."  Dr. Buckiewicz urged Crews to identify aspects of his life over which he still had control and to make an effort to "regain a sense of mastery in his life."  (Id. at 286-87).

Crews also spoke with a social worker on April 10, 2003.  (Id. at 284-86).  The social worker's notes reveal that Crews did not report any problems with respect to his cognitive function or concentration.  Crews further reported that he did not feel depressed at that time.  (Id. at 284-85).

### 3. Hearing Testimony

The first hearing in this case was held on September 5, 2003.  (Id. at 374).  At that hearing, Crews testified that the back injuries he sustained as a result of the accident on December 5, 2000 made it difficult for him to sit for long periods of time.  In that regard, Crews explained that although he liked to go fishing in Rye, New York, more than a one hour drive from his house, he constantly had to shift positions in his chair while fishing so as to "releas[e] the pressure" from his back.  (Id. at 382-83).  Indeed, he

20

testified that he could sit in one place for only thirty minutes before he became
uncomfortable and had to shift positions.  (Id. at 385).  When asked whether he thought
he could "do an office type job," Crews answered that he was not sure, as the answer
would depend on the amount of time the employer required him to sit.  (Id. at 384-85).

      Crews further explained that his back pain made it difficult for him to stand
in one place for more than fifteen to twenty minutes, and to walk, lift, or bend, and that
his doctors had limited him to lifting no more than twenty pounds at one time.  (Id. at
380-81, 393).  The amount of difficulty he had carrying objects weighing less than twenty
pounds depended on how far he had to carry the object.  (Id. at 390-91).  Crews testified,
however, that his back tightened "like a vi[s]e grip" "no matter how small or how big" an
item was.  (Id. at 390-91).  He stated that he had tried many different types of treatment
for his back pain, including chiropractic treatment, physical therapy, nerve blocks, and
cortisone injections, but "nobody [wa]s giving [him] any relief with it."  (Id. at 388-89,
91).  This lack of progress, coupled with the fact that he had purchased a new home just
prior to the accident, left Crews feeling depressed.  (Id. at 391-92).

      Crews testified with respect to his diabetes that Dr. Polepalle had told him
that as a result of this condition, "the nerves in [his] arms and legs were wearing away."
(Id. at 385-86).  He testified further that his feet were numb and tingling, which, in
conjunction with his back pain, further compounded his difficulty walking.  (Id. at 386).
He added that he also experienced tingling in his hands, but could still use them.  (Id.).

After the Appeals Council vacated ALJ's Katz's first decision denying Crews' claim, the ALJ held a second hearing on April 7, 2008.  (Id. at 646).  At this hearing, Crews testified that he still was experiencing difficulty walking as a result of his back problems.  (Id. at 654).  Indeed, he asserted that walking had become such an onerous task that he had asked Dr. Polepalle to provide him with a handicapped sticker for his car, which she declined to do.  (Id. at 413 n.12, 654).  Crews conceded, however, that he passed a physical required in order to obtain his bus monitor position.  (Id. at 656).  He also noted that the last time he received treatment for his back at Castle Point, he was given a TENS Unit, which "somewhat" helped to alleviate the pain.  (Id. at 657).

When ALJ Katz asked Crews whether he was claiming to be disabled because of a mental illness, Crews answered no.  He explained that he had been "depressed for a while" because he had gone from making approximately $40,000 per year prior to the car accident "down to" nothing, and did not receive workers' compensation for ten months after the accident.  Consequently, the home that he had purchased just before the accident had gone into foreclosure.  Crews affirmed, however, that his depression did not interfere with his ability to work.  (Id. at 658-59).

Crews testified with respect to his diabetes that he experienced blurred vision, frequent urination, throbbing pain in his legs, and tingling in his legs, feet, and arms.  (Id. at 660).  He reiterated his discontent with the fact that his back problems limited his ability to exercise, in an effort "to keep the diabetes at bay."  (Id. at 661).

22

He also noted that he was no longer taking insulin shots, but rather pills "which seem[ed] to be working," at the time of the second hearing.  (Id. at 662).

C.    Second ALJ Decision[30]

On June 25, 2008, ALJ Katz issued a written decision in which he concluded that Crews was not disabled within the meaning of the Act at any point after December 5, 2000, the alleged onset date.  In so doing, ALJ Katz applied the five-step sequential analysis required by 20 C.F.R. § 416.920.  (Id. at 407-16).

At Step One, ALJ Katz determined that, although Crews had worked as many as twenty-five to thirty hours per week as a school bus monitor and counselor at a substance abuse rehabilitation center between 2006 and 2008, he had not engaged in substantial gainful activity since the alleged disability onset date.  (Id. at 408).

Turning to Step Two, ALJ Katz concluded that Crews suffered from two severe impairments:  a "vertebrogenic impairment"[31] and a "diabetic impairment."  (Id. at 408-09).  The ALJ explained that Crews' depression did not rise to the level of a severe impairment because there was no evidence that his depression limited his ability to perform the normal activities of daily living or the basic mental demands of competitive

---

[30]    Because an "ALJ making a decision in a case on remand from the Appeals Council . . . is to consider the case de novo when the Appeals Council has vacated the ALJ's previous decision," Uffre v. Astrue, No. 06 Civ. 7755 (GWG), 2008 WL 1792436, at *7 (S.D.N.Y. Apr. 18, 2008), I have not discuss the ALJ's first decision in any detail in this Report and Recommendation.

[31]    Vertebrogenic means "arising in a vertebra or in the vertebral column." Dorland's 2079.

work, such as understanding, remembering, and carrying out simple instructions, using

judgment, responding to supervision, and dealing with changes in a routine work setting.

(Id. at 409).  Moreover, the ALJ noted that Crews testified at the April 7, 2008 hearing

that he was not claiming that he had a mental impairment.  (Id.).

      The ALJ's Step Three analysis consisted of a single sentence:  Crews'

"vertebrogenic impairments do not (whether singly or in combination) 'meet' or

medically equal the criteria of any impairment in the Listing of Impairments."  (Id. at

409-10).  ALJ Katz thus did not specifically discuss the reasoning by which he arrived at

this conclusion, nor did he refer to Crews' "severe" diabetes at this stage of his analysis.

      Turning to the fourth step, ALJ Katz determined that Crews had the RFC to

perform "light" work.[32]  Specifically, the ALJ found that, over the course of an eight-hour

workday, Crews was capable of sitting for up to eight hours, standing or walking for up to

six hours, and occasionally lifting, carrying, pushing, or pulling objects weighing up to

twenty pounds.  The ALJ based these conclusions on "(i) the absence of medical findings

by physicians that [Crews'] impairment [had an] adverse impact on his ability to sit, (ii)

[Crews'] testimony concerning his ability to perform significant work tasks[,] and (iii)

[Crews'] own acknowledgment that he is essentially able to sit without difficulty."  The

ALJ also relied on "clinical findings that (i) [Crews'] gait has been essentially normal, (ii)

---

[32]     "Light" work "involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be
very little, a job is in this category when it requires a good deal of walking or standing, or when
it involves sitting most of the time with some pushing and pulling of arm or leg controls."
20 C.F.R. § 404.1567(b).

[Crews] has been able to work at jobs requiring sitting/standing/walking from 25-30 hours per [week,][33] and (iii) [Crews'] daily activities (which include fishing and child care)."  The ALJ further noted that he relied on Crews' "physician's statements that he is precluded only from lifting/carrying 'heavy' objects and can engage in 'light' work."  (Id. at 414).

In arriving at his RFC determination, the ALJ explained that he accorded greater weight to the assessments of Crews' physical condition offered by Drs. Fraser, Jones, Polepalle, and Schulman than those provided by Drs. Pearl and Raucci, both of whom are chiropractors and, therefore, are not considered "acceptable medical sources" capable of providing "medical opinions" under the Social Security regulations.  (Id. at 411-12 (citing 20 C.F.R. § 404.1513)).  ALJ Katz nevertheless noted that he had considered the chiropractors' observations, if not their medical assessments.  (Id.).  The ALJ also addressed Crews' VA medical records, finding that, despite Crews' frequent complaints of back pain, "no specific limitations in physical functioning have been assessed by his physicians at the VA."  (Id. at 413).

ALJ Katz also discussed why he declined to adopt the opinions of the doctors who opined that Crews was either partially or totally disabled.  Each of these assessments arose in the context of determining whether Crews was disabled for purposes of receiving workers' compensation, rather than social security, disability benefits.  (See

---

[33]     The ALJ erroneously stated that Crews had worked 25-30 hours per day, rather than per week.  (Id. at 414).

25

id. at 152-55, 192, 173-76, 308-11, 313, 370-71, 546-47, 550-51).  The ALJ found this

contextual distinction to be significant because the definition of "disability" under the

New York Workers' Compensation Law ("WCL") differs from that provided in the

Social Security regulations.  Under the WCL, a disability determination turns on the

injured party's ability "to perform the regular duties of his employment."  A person is not

disabled under the Act, however, unless he lacks not only the capacity to perform his past

work, but also "any work existing in significant numbers in the national economy."  (Id.

at 411 (citing N.Y. Workers' Comp. L. § 201(9)(A))) (emphasis added).

      Although ALJ Katz concluded that Crews had the RFC to perform light

work, he also found that Crews could not perform his past relevant work as an aide at a

group home, psychiatric assistant, or shipping room clerk, as all of these jobs were

classified in the Department of Labor's Dictionary of Occupational Titles ("DOT") as

either "medium" or "heavy" work.  (Id. at 414).

      Accordingly, the ALJ proceeded to Step Five, which required him to

determine whether there were other jobs in sufficient numbers in the national economy

that Crews had the capacity to perform.  To fulfill his burden at this step, ALJ Katz

referred to the Medical-Vocational Guidelines of Appendix 2, Subpart P, Part 404

("Appendix 2").  As the ALJ explained, these Guidelines, known as the "Grids," see

Calzada, 2010 WL 4683570, at *14, "serve as an objective standardized basis for

decision-making.  Where vocational factors and [RFC] coincide with all of the criteria of

a particular rule (and no impairment-caused limitation of function directly affects [the

claimant's] capability to perform work activities other than the aforementioned 'strength activities'), [the Grids] 'direct[]' a finding of 'disabled' or 'not disabled.'"  (Tr. 414).

Based on Crews' age (he was forty-one years old as of the alleged disability onset date and forty-nine years old at the time of the April 2008 hearing), education (beyond a high school diploma) and prior work experience, ALJ Katz applied Rules 202.20 and 202.21 of the Grids.  These Rules dictate that "younger individuals"[34] who retain the RFC for light work, who are high school graduates, and who have no previous work experience, experience doing unskilled work, or cannot transfer the skills that they acquired doing skilled or semi-skilled work to the jobs within their RFC,[35] are "not disabled."  Because Crews could perform the full range of light work, ALJ Katz adopted the Grids' conclusion that Crews was not disabled.[36]  (Id. at 414-15).

---

[34]    A "younger individual" is defined as someone between the ages of eighteen and forty-nine.  Appendix 2 § 201(h)(1).

[35]    The Social Security regulations categorize occupations by the amount of skill needed for the job.  A job thus is classified as unskilled, semi-skilled, or skilled.  20 C.F.R. § 404.1568.  These skill levels, in turn, correspond to specific vocational preparation, or SVP, levels outlined in the DOT.  SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  DOT, Appendix C, 1991 WL 688702.  "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9."  SSR 00-4p, 2000 WL 1898704, at *3.  Crews' prior work experience included unskilled work as a shipping clerk, DOT, 1991 WL 687711 (SVP level 2), semi-skilled work as a therapy aide, id., 1991 WL 672940 (SVP level 4), and skilled work as a "mental retardation aide," id., 1991 WL 672941 (SVP level 6).

[36]    In his "Findings," ALJ Katz also noted that Rules 201.27 and 201.28, which differ from Rules 202.20 and 202.21 only in that the former apply to individuals with the RFC to perform only "sedentary" work, similarly directed a finding of "not disabled."  (Tr. 415).

II.     Applicable Law

    A.     Disability Determination

        The term "disability" is defined in the Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A).  In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920.  The Second

Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider him disabled without considering vocational
> factors such as age, education, and work experience . . . .
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he has the [RFC] to perform his past work.
> Finally, if the claimant is unable to perform his past work, the
> [Commissioner] then determines whether there is other work
> which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of the process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the Commissioner finds that a claimant is disabled (or not disabled) at an early step in the process, he is not required to proceed with any further analysis.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999). However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work.  DeChirico, 134 F.3d at 1180.

In assessing whether a claimant has a disability, the factors to be considered include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted).

B.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."

29

42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. See Hickson v. Astrue, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

C.    Treating Physician Rule

The "treating physician rule" requires an ALJ "to give controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence." Rosado v. Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.927(d)(2)). Nonetheless, the Commissioner need not grant "controlling weight" to a treating physician's opinion as

30

to the ultimate issue of disability, as this decision lies exclusively with the Commissioner. See 20 C.F.R. § 404.1527(e)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("treating physician's statement that the claimant is disabled cannot itself be determinative").  The Commissioner must, however, always provide "good reasons" for the weight, if any, he gives to a treating source's opinion.  20 C.F.R. § 404.1527(d)(2).

III.    Application of Law to Facts

Crews contends that the Commissioner's June 25, 2008 decision rejecting his claims for a period of disability and disability insurance benefits "is not supported by substantial evidence and is against Social Security law."  (ECF No. 12 ("Pl.'s Mem.") at 1).  He further argues that he did not receive a full and fair hearing.  (Id.).  Because a court must be satisfied that a claimant has had a full and fair hearing before determining whether the Commissioner's conclusions are supported by substantial evidence, Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009), I first turn to Crews' process-related claim.

A.    Full and Fair Hearing

The basis for Crews' contention that he did not receive a full and fair hearing is unclear.  Crews appears to take issue with the fact that the ALJ repeated the "same findings" in his second decision with respect to Crews' ability to drive one hour to go fishing, assist in completing housework, and perform routine activities of daily living, even though Crews did not testify about these topics at the second hearing.  (Pl.'s Mem. at 15; see also Tr. 414).  As Crews puts it, "[a]lthough the second hearing was supposed

31

to be a de novo hearing, it really was not . . . .  It is almost as if [the second decision] was copied from the first decision."  (Pl.'s Mem. at 15).

In its remand order, which ALJ Katz was required to follow, see 20 C.F.R. § 404.977(b), the Appeals Council directed him to "consider all the pertinent evidence" before reassessing Crews' RFC (Tr. 424).  "All the pertinent evidence" plainly includes all evidence in the record bearing on the issue of Crews' RFC, including Crews' testimony during the first hearing.  Accordingly, the ALJ did not err by considering this evidence when determining Crews' RFC on remand.  Moreover, although the ALJ's second decision is substantially similar to his first, the SSA's own procedures require that an ALJ only "consider all pertinent issues de novo" upon remand, i.e., the ALJ need not redetermine every single issue addressed in the prior decision.  See Calderon v. Astrue, 683 F. Supp. 2d 273, 277 (E.D.N.Y. 2010) (citing Soc. Sec. Admin. Office of Hr'gs and Appeals, HALLEX:  Hearings, Appeals and Lit. Law Manual, I-2-8-18 (2008) (first emphasis added)).

In addition, since Crews was represented by counsel at both hearings and there is nothing to indicate that ALJ Katz failed to develop an adequate record, there is no basis from which the Court could conclude that Crews did not receive a full and fair hearing in accordance with SSA regulations and the Act.  See Crespo v. Barnhart, 293 F. Supp. 2d 321, 324 (S.D.N.Y. 2003) ("It is the Commissioner's affirmative responsibility to develop the record in such a way as to ensure a full and fair hearing.").

B.    <u>Disability Analysis</u>

1.    <u>Step One</u>

At Step One of the five-step disability analysis, ALJ Katz found that Crews had not engaged in substantial gainful activity between December 5, 2000, the alleged onset date of his disability, and June 25, 2008, the date the ALJ issued his second decision.  (Tr. 408).  Neither party challenges this determination, (<u>see</u> Pl.'s Mem. at 1-20; ECF No. 10 (Def.'s Mem.) at 18-24), which favored Crews.

2.    <u>Step Two</u>

Turning to Step Two, neither party disputes the ALJ's finding that Crews' "vertebrogenic" impairments and diabetes constitute "severe impairments."  (Tr. 409). Indeed, an impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  Here, there can be no doubt that Crews' back problems significantly limited his physical ability to perform basic work activities, as Drs. Polepalle, Schulman, and Chhabra all indicated that Crews would be capable of performing only a position that did not require heavy lifting, repetitive bending, twisting, or carrying.  (<u>See</u> Tr. 156-58, 228-30, 242-43).  Although the ALJ's conclusion that Crews' diabetes rose to the level of a "severe impairment" is more questionable, the Commissioner does not challenge this finding.  Accordingly, I will assume for present purposes that Crews' diabetes also was a "severe" impairment.

In addition, Crews does not appear to quarrel with the ALJ's determination that his depression did not amount to a "severe impairment."  (<u>See</u> Pl.'s Mem. at 15-16

33

("To [Crews] it was the back problem that interfered with his work.  If he didn't have the back problem he would be working, he would still have his house and he would not have been depressed.")).  To the extent that Crews does challenge this finding, however, his own testimony from the April 2008 hearing plainly belies this position.  When Crews was asked whether his "mental problem" interfered with his ability to work, he answered:  "I don't think, no, to be honest."  (Tr. 658).  There also is no medical evidence in the record that Crews' depression in any way "significantly limit[ed] his . . . mental ability to perform basic work activities."  See 20 C.F.R. § 416.920(c).

       3.     <u>Step Three</u>

      As noted previously, the ALJ's Step Three analysis consisted of a single sentence:  "The [ALJ] finds that [Crews'] vertebrogenic impairments do not (whether singly or in combination) 'meet' or medically equal the criteria of any impairment in the Listing of Impairments."  (Tr. 409-10).  The ALJ thus did not support this conclusion with any reasoning whatsoever; nor did he even mention Crews' "severe" diabetes.  These deficiencies, however, do not present an insurmountable problem for the Commissioner.  As the Second Circuit has noted, "the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'"  <u>Salmini v. Comm'r of Social Sec.</u>, 371 F. App'x 109, 112 (2d Cir. 2010) (quoting <u>Berry</u>, 675 F.2d at 469); <u>see also Batista ex rel. M.B. v. Astrue</u>, No. 08-CV-2136 (DLI), 2010 WL 3924684, at *7-9

(E.D.N.Y. Sept. 29, 2010) (affirming ALJ's "implicit findings" that claimant did not meet or medically equal Listing 104.13 for rheumatic heart disease and Listing 102.08(B)(3) for hearing impairments, even though the ALJ "did not specifically discuss the requirements" of these Listings).

        Here, there is substantial evidence to support the ALJ's conclusions that Crews' back problems and diabetes did not meet or medically equal the relevant Listings. Section 1.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"), which pertains to "Disorders of the spine," is the Listing applicable to Crews' back and neck impairments.  See Appendix 1 § 1.04.  To satisfy this Listing, a claimant must demonstrate that his impairment falls into one of the Listing's three subsections, which, in turn, require a claimant to show:

> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in

> inability to ambulate effectively, as defined in
> 1.00B2b.

Appendix 1 § 1.04(A)-(C).  With respect to Subsection A, the record contains evidence of

only one positive SLR test,[37] which was performed by Dr. Schulman on July 27, 2001.

(Tr. 156-57; see also id. at 188, 228-29, 232, 236, 357, 541, 545, 550-51 (negative SLR

tests)).  Even in that instance, however, the test was performed only in the supine

position.  (Id. at 157).  Accordingly, because there was no evidence of a "positive

straight-leg raising test (sitting and supine)," Appendix 1 § 1.04(A) (emphasis added),

Crews has failed to meet the requirements of Subsection A.

Crews fares no better with respect to the remaining two subsections of

Listing 1.04.  The record makes no mention of Crews suffering from spinal

arachnoiditis,[38] therefore precluding a finding of disability under Subsection B.  Id.

§ 1.04(B).  Additionally, there is substantial evidence that Crews could "ambulate

effectively," within the meaning of Section 1.00(b)(2)(B) of Appendix 1.  Thus, every

physician to examine Crews observed that he had a normal gait, a fact that did not escape

ALJ Katz.  (Tr. 157, 161, 166, 241, 263, 297, 356, 414, 546-48, 552).  It further bears

---

[37]     The straight leg raising test is positive "when pain is reproduced down the
posterior thigh below the knee between the angle of 30 to 70 degrees."  Brathwaite v. Barnhart,
04 Civ. 2850 (GBD) (DF), 2007 WL 5322447, at *3 n.4 (S.D.N.Y. Dec. 20, 2007) (internal
quotation marks omitted).

[38]     Spinal arachnoiditis is an inflammation of the membrane covering the spinal cord.
Dorland's 124.

36

mention that Dr. Polepalle declined to help Crews obtain a handicapped sticker for his car because she preferred seeing it issued to "somebody who really needs it," a decision with which Crews was "okay." (Id. at 654). Moreover, in 2003, Crews even reported to Dr. Kim that his back pain was at a tolerable level. (Id. at 278, 479). It follows that Crews' back problems did not meet or equal Subsection (C) of Listing 1.04.

Crews likewise cannot show that his diabetes met or medically equaled Listing 9.08, which requires a claimant to show (a) "[n]europathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station," (b) acidosis,[39] or (c) retinitis proliferans.[40] Appendix 1 § 9.08(A)-(C). Although there is ample evidence that Crews suffered from neuropathy as a result of his diabetes, (Tr. 177, 224, 263, 458), Crews' "gross and dexterous movements" as well as his "gait and station" were not significantly compromised by his neuropathy. Indeed, Drs. Fraser, Chhabra, Polepalle, and Rehmani each observed at various points throughout the alleged period of disability that Crews had either full or nearly full strength in his extremities. (Id. at 161, 166, 238, 242, 297). Dr. Chhabra, in particular, commented that Crews' hand and finger

---

[39]   Acidosis is "the accumulation of acid and hydrogen ions or depletion of the alkaline reserve (bicarbonite content) in the blood and body tissues, resulting in a decrease in pH." Dorland's 17.

[40]   Retinitis proliferans is "a condition sometimes resulting from intraocular hemmorhage, with neovascularization and formation of fibrous tissue bands extending into the vitreous from the surface of the retina." Id. at 1658. This condition is often associated with diabetic retinopathy. See Duquesnay v. Astrue, No. 06 Civ. 11351 (DC), 2007 WL 3095413, at *11 n.19 (S.D.N.Y. Oct. 23, 2007).

dexterity were intact, his grip strength was five out of five, and he had "no limitations

with the use of his upper extremities for fine and gross motor activities." (Id. at 243).

Crews himself acknowledged at the September 5, 2003 hearing that he could still use his

hands. (Id. at 386). Furthermore, as noted previously, the physicians who examined

Crews consistently found his gait to be normal. (Id. at 157, 161, 166, 241, 263, 297, 356,

414, 546-48, 552). In addition, there was no evidence of either acidosis or retinitis

proliferans. (See id. 208, 270, 614, 621).

      4.    Step Four

      At the fourth step in the five-step sequential analysis, ALJ Katz determined

that Crews had the RFC to perform light work. (Id. at 410-14). In reaching this

conclusion, the ALJ properly gave controlling weight to the opinion of Dr. Polepalle,

Crews' treating physician, that Crews had the capacity to perform at least some work, as

long as it did not involve heavy lifting, bending, or twisting. (See id. at 224, 228-30).

This opinion is consistent with the opinion of Dr. Schulman that Crews could "perform a

light duty position with no heavy lifting or repetitive bending," (id. at 158), as well as that

of Dr. Chhabra, who concluded that Crews suffered from only "mild-to-moderate

limitations with bending, lifting, carrying, and with heavy exertional work, as well as

with prolonged periods of sitting, standing, or climbing stairs." (Id. at 243).

      Additionally, Dr. Polepalle's opinion is supported by other substantial

evidence in the record. Perhaps the strongest supporting evidence that Crews had the

RFC to perform light or sedentary work is the fact that he worked as a bus monitor, which

is classified in the DOT as a "light" position, see DOT, 1991 WL 673102, as well as a

drug and alcohol counselor, which involves sedentary work, see id., 1991 WL 646633,

between October 2006 and June 2008.  (Tr. 649-53).  Indeed, he even passed a physical in

order to obtain his job as a bus monitor.  (Id. at 656).

    ALJ Katz also properly accorded less weight to the opinions of Drs. Hui,

Jones, Pearl, Polepalle, and Raucci that Crews was either totally or partially disabled.  As

an initial matter, it is well settled that an ALJ need not give controlling weight to the

opinion of a treating physician, let alone a consulting physician, that the claimant is

disabled.  20 C.F.R. § 404.1527(e)(1); Snell, 177 F.3d at 133.  Moreover, as a number of

courts have recognized, a physician's or chiropractor's opinion that a claimant is disabled

within the meaning of the WCL is not binding on the Commissioner, given the differing

definitions of "disability" under the WCL and the Act.  See Riley v. Astrue, No. 06 Civ.

7762 (JSR) (DFE), 2008 WL 2696259, at *14 (S.D.N.Y. July 7, 2008); Dibernardo v.

Chater, 979 F. Supp. 238, 243 (S.D.N.Y. 1997); Rosado v. Shalala, 868 F. Supp. 471, 473

(E.D.N.Y. 1994).  The ALJ nevertheless should give such an opinion "some weight" and

consider it in rendering his decision.  Havas v. Bowen, 804 F.2d 783, 786 n.1 (2d Cir.

1986).  Here, ALJ Katz did exactly that by adopting the findings of these physicians and

chiropractors that Crews would be unable to perform any of his past work, which finding

is consistent with the WCL's concept of disability.  See N.Y. Workers' Comp. L.

§ 201(9)(A) (defining "disability" as "the inability of an employee . . . to perform the

regular duties of his employment or the duties of any other employment which his employer may offer him at his regular wages and which his injury or sickness does not prevent him from performing," or "to perform the duties of any employment for which he is reasonably qualified by training and experience").

Finally, although Crews seems to contest the ALJ's conclusion that Crews could perform light work, even though the ALJ had previously found that Crews could carry out only sedentary work, (see Pl.'s Mem. at 13-14; Tr. 17, 19), as discussed below, a finding that Crews had the RFC to perform only sedentary work would not have changed the outcome of this case.

### 5. Step Five

At Step Five, ALJ Katz properly determined that there were jobs in the national economy in significant numbers that Crews could perform. The ALJ did not err by relying exclusively on the Grids to make this determination because Crews' diabetes and depression, to the extent they could be considered nonexertional limitations,[41] clearly were not so severe as to preclude use of the Grids. See Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986) (application of the Grids is inappropriate where "a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations") (internal quotation marks and citation omitted) (emphasis added).

---

[41]     Nonexertional limitations include, inter alia, "difficulty functioning because [the claimant is] nervous, anxious, or depressed; . . . difficulty maintaining attention or concentrating; . . . difficulty understanding or remembering detailed instructions; . . . difficulty in seeing or hearing; . . . or . . . difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a.

Furthermore, ALJ Katz properly relied on Rules 202.20 and 220.21 of the Grids.  As noted previously, these rules apply to claimants who retain the RFC for light work, are younger individuals with high school diplomas, and have no previous work experience, unskilled work experience, or cannot transfer the skills that they acquired doing skilled or semi-skilled work to the jobs within their RFC.  Appendix 2 §§ 202.20, 202.21.  Here, it is undisputed that Crews was forty-one years old on his alleged onset date and forty-nine years old at the time of the April 2008 hearing, had graduated from high school, and had unskilled work experience, as well as non-transferable semi-skilled and skilled experience.  (See Tr. 414-15).  Accordingly, the ALJ properly fulfilled his burden at Step Five by using these rules to conclude that Crews was not disabled.  Indeed, even if the ALJ had found that Crews was limited to sedentary work, Rules 201.27 and 201.28 would have dictated the same result.  Appendix 2 §§ 201.27, 201.28.

IV.   Conclusion

For the foregoing reasons, the Court should grant the Commissioner's motion for judgment on the pleadings (ECF No. 9) and deny Crews' cross-motion for judgment on the pleadings (ECF No. 11).

V.   Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Laura Taylor Swain and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Swain. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:      New York, New York
            March 27, 2012


                                        FRANK MAAS
                                United States Magistrate Judge


Copies to:

Honorable Laura Taylor Swain
United States District Judge

Carol S. Goldstein, Esq.
22 Mine Road
Monroe, New York 10950

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers Street
3rd Floor
New York, New York 10007